STATE of Tennessee, Appellee,

v.

Larry B. HARRIS, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

June 12, 1992.

Permission to Appeal Denied by Supreme Court Aug. 2, 1993.

Michael V. Thompson, Nashville, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Jeannie Kaess, Asst. Atty. Gen., Nashville, Victor S. Johnson, III, Dist. Atty. Gen., Cheryl Blackburn and Steve Dozier, Asst. Dist. Attys. Gen., Nashville, for appellee.

## OPINION

PEAY, Judge.

In June of 1989, the defendant was indicted on two counts of aggravated rape. At a jury trial he was found guilty of rape and of aggravated rape, receiving Range I concurrent sentences of ten years and twenty-five years respectively.

Bringing this appeal as of right, the defendant raises four issues. He contends that: (1) the trial court improperly denied his motion to appoint to him or to provide funds for the employment of an expert in the field of DNA (deoxyribonucleic acid) research; (2) the trial court improperly denied his motion *in limine* to prohibit the State's introduction of DNA forensic analysis evidence; (3) there was not sufficient evidence for the jury to find him guilty of aggravated rape; and (4) several of the enhancement factors used by the trial court to support the maximum sentence were improperly applied. We find the defendant's first three issues to be without merit. However, because of the ambiguous nature of the trial court's findings in sentencing, this case is remanded for resentencing consistent with this opinion.

The facts of the case may be briefly summarized. When the rapes occurred on March 8, 1989, the victim had been a member of the cleaning staff at Memorial Hospital in Nashville for only a few days. According to the victim's account of the event, the defendant, who was her supervisor, followed her onto a deserted floor of the building. When she sat down to take a break, he jerked her out of the chair and proceeded to perform both digital and penile rape upon her. After doing so, he wiped himself off with one of her cleaning towels and directed her to get back to work. The victim did so and told no one of the rape until she arrived home that evening and informed her husband. She was then taken to General Hospital in Nashville where she underwent a rape examination.

Following her reporting of the incident to the authorities, the defendant was immediately questioned. At a later date several blood samples were taken from the defendant for the purpose of DNA analysis, and on April 11, 1989, he was arrested and charged as noted above.

The State informed the defendant that it intended to use the results of the DNA analysis as evidence. After being declared indigent by the court, the defendant filed a motion requesting the court to appoint him an expert in the field of DNA research, which motion the court denied. At the conclusion of a pretrial hearing, the court also denied the defendant's motion *in limine* to prohibit the State from introducing the results of the DNA analysis into evidence.

■ In his first issue the defendant contends that the trial court erred in failing to grant his motion to appoint or provide funds for his employment of an expert in the field of DNA research to assist in his defense. Although the trial court found that the defendant was indigent, it refused to grant funds for the hiring of an expert witness who presumably would have been used to attack the reliability of the State's DNA evidence.

Tennessee courts have repeatedly held that a defendant is not entitled to funds for the employment of an expert witness in noncapital cases, and that this issue is best left to the discretion of the legislature. *State v. Williams*, 657 S.W.2d 405, 411 (Tenn.1983); *Graham v. State*, 547 S.W.2d 531, 536 (Tenn. 1977); *State v. Chapman*, 724 S.W.2d 378, 380 (Tenn.Crim.App.1986). We find that our legislature has provided statutory authority for the compensation of a defendant's experts in capital cases only. *See* T.C.A. § 40–14–207(b).

However, relying upon the authority of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the defendant claims that the lack of an expert witness violates his right to due process. In *Ake*, the Supreme Court held that this indigent defendant's constitutional rights were violated as there had been a serious question concerning his mental stability and he had not been appointed a psychiatric examiner. We find no fault with this statement of the holding but note that *Ake* was facing the death penalty and that this Court has expressed concern over the broadening of the *Ake* ruling to include noncapital cases such as the present one. *See State v. Lambert*, 741 S.W.2d 127, 131 (Tenn.Crim.App.1987).

This case is further distinguishable in a myriad of ways. First, Ake had a long history of mental disorders and was in clear need of a psychiatric evaluation, while there is only vague speculation as to what an expert for the defendant in this case might find or say. In addition, Ake merely requested an expert to perform a psychiatric evaluation, while this defendant requested that an additional expert be appointed or that funds be provided for the hiring of an expert of his own choosing. Finally, there was absolutely no expert testimony offered at the *Ake* trial as to the state of the defendant's mental condition. Quite to the contrary, competent testimony was offered by the State in the present case as to the procedures and reliability of DNA testing. *Cf. State v. Evans*, 710 S.W.2d 530, 534 (Tenn.Crim.App.1985) (distinguishing a request for a ballistics expert from the holding in *Ake* ). Based upon the aforementioned reasons, we conclude that *Ake* is not the controlling authority which the defendant would have us believe.

Even *Ake* requires the defendant to make an *"ex parte* threshold showing" that his or her sanity at the time of the offense is likely "to be a significant factor at trial", thus entitling the defendant access to an expert. *Ake*, 470 U.S. 68, 82–83, 105 S.Ct. at 1087, 1096–97. As reflected by *Evans*, 710 S.W.2d 530, 534, this Court has applied the "threshold showing" test, and more recent decisions make it clear that this test is still applicable. If the case does not involve a capital offense, "there is no authority for the employment of an expert at state expense without a threshold showing of a denial of due process by the failure to allow such employment". *State v. Robert June Dyer, Jr.*, No. 4, Henderson County, 1991 WL 44215 (Tenn.Crim.App. filed April 3, 1991, at Jackson); *see also State v. Phillips*, 728 S.W.2d 21, 24–25 (Tenn.Crim. App.1986).

Having reviewed the record, we find that the defendant failed to meet this threshold showing of a denial of due process. During the hearing on his motion to obtain funds for an expert witness, the defendant did not establish that an expert was vital to his defense. Furthermore, absolutely no evidence was presented concerning how the denial of such an expert would result in a violation of due process. The defendant failed to disclose what his defense would be; thus, it is possible that the defendant could have claimed to have had consensual intercourse with the victim.[1] Under these circumstances there would have been no need for a DNA expert because a determination that the defendant's sperm had been found in the victim would have been consistent with this account of the incident. As there was no argument put before the court that the defendant had not had sex with the victim, the trial judge was justified in denying the defendant's motion to procure funds for an expert in the field of DNA testing.

■ In his second issue the defendant asserts that the trial court improperly denied his motion *in limine* to prohibit the State's introduction of DNA forensic analysis evidence. The trial court, conducting a pretrial hearing on the question of admissibility of this evidence, heard testimony from Dwight Adams, a special agent assigned to the DNA Analysis Unit of the FBI Laboratory in Washington, D.C., and from Dr. A.G. Kasselbert, a member of the faculty at Vanderbilt Medical School. After lengthy direct and cross-examinations of both witnesses, the trial court concluded that the autoradiographs and expert testimony concerning this topic were admissible. We agree with the lower court's conclusion.

Agent Adams testified that DNA is a molecule which carries the body's genetic information. DNA is found in all living organisms and is present in human bodily fluids, including blood, saliva, vaginal secretions, and semen. Every person has a unique DNA pattern, thus, the term "DNA finger-printing". The process of obtaining an individual's DNA pattern or fingerprint is extremely complex with a variety of steps and procedures. Basically, the first step in RFLP (Restriction Fragment Length Polymorphism) is to extract the DNA molecule from the cell. The strands of DNA are then cut using special enzymes after which they are placed on an electrically charged gel. The negatively charged DNA reacts to the electric current causing the pieces to separate by size. Probes are then used to locate and bind with specific parts of the DNA. If a probe does bind, radioactivity accumulates at the site. Finally, an X-ray is made of the accumulations of radioactivity caused by the different bound probes, which form patterns of bands similar in appearance to product bar codes. The pattern formed from a sample taken from a defendant may then be compared with, for example, the pattern formed from a sample of semen recovered from the scene of an alleged rape. When compared in this manner, a match can either be established or ruled out. Furthermore, a statistical probability of someone else's sharing the subject's DNA pattern can be determined by comparing the subject's DNA profile to a known group of other samples.[2] *See* Comment, *Spencer v. Commonwealth and Recent Developments in the Admissibility of DNA Fingerprint Evidence,* 76 Va.L.Rev. 853 (1990).

Contending that DNA analysis is novel scientific evidence, the defendant believes that it should have been ruled inadmissible. There is a disagreement as to what the proper standard is in Tennessee concerning the admission of scientific evidence and testimony. The defendant asserts that the proper standard is that set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). He cites as authority *State v. Johnson,* 717 S.W.2d 298, 303 (Tenn.Crim.App.1986), which states that for many years the standard in Tennessee has been that set forth in *Frye.* In addition, the advisory comment to Tenn. R.Evid. 702 provides that "Tennessee law is consistent with *Frye.*" However, the State

1. At the sentencing hearing we note that the defendant did testify that the victim had voluntarily had sexual relations with him.

2. In the present case the odds of someone else having the same DNA pattern as the defendant were one in one hundred forty-eight million.

argues that Tenn.R.Evid. 702 and 703 have superseded *Frye* believing that if the legislature had intended for the proper standard to remain as set forth in *Frye*, it would not have adopted these new rules. Having determined that DNA analysis is admissible under either the *Frye* test or Tenn.R.Evid. 702 and 703, we need not resolve this alleged conflict.

In order for evidence to be admissible under the *Frye* test, it must have "gained general acceptance in a particular field in which it belongs." *Frye*, 293 F. 1013, 1014. Agent Adams and Dr. Kasselbert both testified that the methods used in DNA analysis have been around for a number of years and are widely used in other related fields such as medical research and diagnosis. In addition, the growing number of law enforcement agencies and private firms conducting DNA analysis is proof that its scientific acceptance is becoming more universal. Furthermore, there is an increasingly long line of cases from other jurisdictions which conclude that the RFLP method of DNA analysis used in this case satisfies the *Frye* test. *See Cobey v. State*, 80 Md.App. 31, 559 A.2d 391, 398 (1989); *State v. Schwartz*, 447 N.W.2d 422, 425 (Minn.1989); *People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985, 995 (N.Y.Sup. Ct.1989); *State v. Ford*, 301 S.C. 485, 392 S.E.2d 781, 784 (1990).

Under the criteria set forth in Tenn. R.Evid. 702, expert testimony is allowed "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact". There was uncontroverted testimony that the type of DNA analysis done by Agent Adams is extremely reliable. The FBI laboratory is tested on a regular basis and has never been found to have made a false match. In fact, Agent Adams testified that with the stringent protocol measures used by his department, it would be impossible to get a false DNA match. He explained that an incorrectly performed test would simply result in an inconclusive result, not an incorrect match. Given this kind of reliability and the unquestioned expertise of Agent Adams, there is little doubt that the DNA analysis offered in this case would substantially aid the trier of fact. Many other jurisdictions have come to similar conclusions when evaluating the admissibility of DNA evidence. *See, Caldwell v. State*, 260 Ga. 278, 393 S.E.2d 436, 441 (1990); *State v. Pennington*, 327 N.C. 89, 393 S.E.2d 847, 854 (1990); *Spencer v. Commonwealth*, 240 Va. 78, 393 S.E.2d 609, 621, *cert. denied*, 498 U.S. 908, 111 S.Ct. 281, 112 L.Ed.2d 235 (1990).

Since the trial of this case, our legislature has seen fit to address the issue of DNA analysis by adopting Tenn.Pub. Acts ch. 480, § 5. T.C.A. § 24-7-117 (Supp.1991). In this act the legislature clearly mandated that DNA analysis is to be admissible in evidence without the need for expert testimony as to its reliability as long as it meets the standards set forth in the Tennessee Rules of Evidence. This is another drop of water in the growing tidal wave of opinion that DNA analysis should be admissible evidence and should be helpful in deciding future cases of this nature.

Based upon the foregoing reasons, we find that the trial court correctly denied the defendant's motion seeking to prohibit the introduction of DNA evidence.

■ In his third issue the defendant contends that the evidence was insufficient to support his conviction for aggravated rape. At the time of the commission of the offense, unlawful sexual penetration accompanied by personal injury to the victim constituted "aggravated rape", T.C.A. § 39-2-603(a)(2) (1982); "bodily injury or serious bodily injury" constituted "personal injury", T.C.A. § 39-2-602(9) (1982); and "a cut, abrasion, bruise, burn, or disfigurement; physical pain; illness or impairment of the function of a bodily member, organ, or mental faculty" constituted "bodily injury". T.C.A. § 39-2-101(a)(1) (1982).

While testifying at trial, the victim stated that during the rape the defendant had pulled her out of a chair causing her hip to hit the corner of a table. She also testified that the actual penetration had been very painful. Furthermore, the physician who had examined the victim a few hours later confirmed the existence of a small bruise on her hip and stated that the victim's pelvic area was more tender than normal, as was to be expected after painful intercourse.

In support of his argument that the victim's injuries do not rise to the level required for aggravated rape, the defendant attempts to rely upon *State v. Henderson*, 623 S.W.2d 638 (Tenn.Crim.App.1981). However, *Henderson* dealt with the issue of whether a victim's mental suffering and anguish rises to the level of bodily injury. As such is not at issue here, *Henderson* is clearly not on point.

Our legislature has included bruising and physical pain as adequate elements justifying a conviction for aggravated rape. It is not the duty of this Court to apply size or degree requirements to such unambiguous legislation. Consequently, given the presence of a bruise, the tenderness of the pelvic area, and the testimony of the victim and the examining physician, there were sufficient grounds for a rational trier of fact to find the defendant guilty of aggravated rape. This issue is, therefore, without merit.

In his fourth and final issue the defendant asserts that the trial court erroneously applied several enhancement factors and that he should have received the minimum on both counts. He argues that the enhancement factors articulated in T.C.A. § 40–35–114(7) and –114(15) were improperly applied to his case.

In considering this issue, we are required to conduct a *de novo* review on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40–35–401(d). Having conducted such a review, we find that the trial court properly applied T.C.A. § 40–35–114(15), the enhancement factor concerning the abuse of a public or private trust. The record supports the conclusion that the defendant used his position as the victim's supervisor to facilitate the commission of these crimes. Prior to the offenses he followed her all evening under the pretense of checking on her cleaning work. Had it not been for their professional relationship as supervisor and employee, it seems unlikely that the victim would have allowed herself to remain alone on the floor of a building at night with a man she hardly knew. Therefore, the enhancement factor concerning the violation of a private trust squarely applies in this case.

However, while we conclude that the above enhancement factor was applicable, we do find the defendant's contention concerning T.C.A. § 40–35–114(7) to be meritorious. In order to satisfy this enhancement factor, the crime must have "involved a victim and [have been] committed to gratify the defendant's desire for pleasure or excitement". Believing that every rape is implicitly committed for this purpose, the defendant alleges that this factor should not apply to those convicted of rape. We are unwilling to accept this assertion as being universally true.

After reviewing various decisions rendered by this Court regarding this issue, we believe that the sentencing court must scrutinize this enhancement factor very closely before applying it to cases of rape. *See e.g., State v. Scott*, 735 S.W.2d 825 (Tenn. Crim.App.1987). "Common sense would dictate that an enhancement factor which is normally present in a certain type of crime should not carry much weight, in and of itself". *State v. James Robert Miller*, No. 1185, Hamilton County, 1991 WL 105277 (Tenn.Crim.App., filed June 18, 1991, at Knoxville); *see also State v. Lorenzo Puente Salazar*, No. 02C01–9105–CR–00098, Shelby County, 1992 WL 4785 (Tenn.Crim.App. filed January 15, 1992, at Jackson). However, it cannot be said that a defendant's desire for pleasure and excitement should be given no weight in all cases, given the various motivations of rapists. *State v. Kevin L. Gaskell*, No. 285, Bradley County, 1991 WL 112275 (Tenn.Crim.App. filed June 26, 1991, at Knoxville). As in *Gaskell*, the present record does not reflect what facts the trial court relied upon to support this factor.

According to T.C.A. § 40–35–210 the minimum sentence within the range is the presumptive sentence; therefore, the sentencing court must start at the minimum and enhance the sentence as appropriate for the enhancement factors and then reduce the sentence as appropriate for the mitigating factors. The 1989 Sentencing Act does not mandate the weight that the trial court must assess each factor. Given the fact that the enhancement factors in the present case need to be readdressed, the weight to be given the mitigating factors found may also require

further examination in view of the trial court's having imposed the maximum sentence.

For the aforementioned reasons, the defendant's convictions are affirmed, and this cause is remanded to the trial court for re-sentencing in accordance with the requirements of this opinion and T.C.A. § 40–35–101, *et seq.*

SCOTT, J., concurs and dissents and files opinion.

WADE, J., concurs and files opinion that is not for publication.

SCOTT, Judge, concurring and dissenting.

I concur in the judgment that the convictions should be affirmed. However, I dissent from that portion of the opinion which reverses the judgment setting the sentence and remands this case to the trial court for resentencing. The majority has expressed its dissatisfaction with the use of the enhancement factor, that the crime involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, Tenn.Code Ann. § 40–35–114(7), in rape cases. I also do not agree with the concurring opinion or the cases cited therein, which seek to limit the use of this enhancement factor in rape cases.

As the writer of the majority points out, the appellant alleges that this factor should *never* apply because every rape is implicitly committed for the purpose of pleasure or excitement. Like the majority, I do not accept that as being a universal truth. However-

er, at the same time, I do not believe that the sentencing court "must scrutinize this enhancement factor very closely before applying it to cases of rape." I do not believe this factor should be any more closely scrutinized than any other enhancement or mitigating factor.

In cases of rape, as in all cases, the trial judge should look to the facts and circumstances of the offense. Some acts of rape apparently are committed for the pleasure that results from sexual intercourse. Others are pure acts of brutality, apparently resulting from a desire to abuse another human being. Rapes are not fungibles. All are different, just as all bank robberies and murders are different. Trial judges see those differences and sentence accordingly.

In this case the appellant, who was the victim's supervisor, stalked the victim as she performed cleaning duties at Memorial Hospital. When she arrived at a deserted floor, he used the opportunity to rape her. It is clear from the facts that this offense was clearly committed to gratify the appellant's desire for pleasure or excitement. The trial judge properly so found and applied that enhancement factor. I would affirm the judgment.